# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA v. LUIS MIJANGOS | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO. 10-1476 M |

Complaint for violation of Title 18, United States Code, Section 875(d) (Extortion)

FILED
CLERK, U.S. DISTRICT COURT

JUN 17 2010

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| NAME OF MAGISTRATE JUDGE ROSALYN M. CHAPMAN | UNITED STATES MAGISTRATE JUDGE | LOCATION Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE On or about August 14, 2008 | PLACE OF OFFENSE Orange County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

2011 JUN —
CLERK U.S....
CENTRAL DIST....
BY

## SEE ATTACHMENT

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
  (See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT |
|---|---|
| | OFFICIAL TITLE SA Tanith Rogers Federal Bureau of Investigation (FBI) |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE June 17, 2010 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

Ausa Mark Krause          REC: Detention (Warrant)

# A F F I D A V I T

I, Tanith Rogers, being duly sworn, hereby depose and state:

## I

## INTRODUCTION

1.   I am employed as a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and have been employed by the FBI since March 2008.  I am currently assigned to the Cyber Squad in the Los Angeles, California field office.  In that assignment, I am responsible for investigating computer and high-technology crimes, and I am trained and authorized to investigate the offenses alleged herein.  Prior to becoming an FBI agent, I completed the 21-week FBI Basic Agent Training Course in Quantico, Virginia, which included training from the FBI regarding computer technology, computer fraud, intellectual property crimes, and white collar crime.  I graduated from the University of Washington where I completed a degree in Politics and Values.  Prior to my work in the FBI, I was a Narcotics Detective for the City of Federal Way Police Department in Washington State.  During the eight and one-half years I worked for the police department, I investigated a plethora of crimes included but not limited to, computer sex crimes, drug crimes and violent crimes.

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various FBI agents and witnesses.  This affidavit is intended to show merely that there is sufficient

probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

II

**PURPOSE OF AFFIDAVIT**

3.  This affidavit is submitted in support of a criminal complaint and an arrest warrant charging **LUIS MIJANGOS** (**"MIJANGOS"**) with violating the following: Title 18, United States Code, Section 875(d), Extortion.  This affidavit is also made in support of an application for a search warrant to search the premises located at 2326 W Monica Lane, Santa Ana, 92706-1246 (hereinafter the **"SUBJECT PREMISES"**), further described below in paragraph 4 and in Attachment A, for the items listed in paragraphs 20-21, as further described in Attachment B, which constitute the fruits, instrumentalities, and evidence of violations of (1) Title 18, United States Code, Section 875(d), Extortion; (2) Title 18, United States Code, Section 1029, Access Device Fraud, (3) Title 18, United States Code, Section 1030(a)(2)(C), (c)(2)(B)(ii), Obtaining Information from a Protected Computer in Furtherance of a Criminal and Tortious Act; (4)  Title 18, United States Code, Section 1030(a)(5)(A), Intentional Damage to a Protected Computer; (5) Title 18, United States Code, Section 1343, Wire Fraud; (6) Title 18, United

2

States Code, Section 1344, Bank Fraud, (7) Title 18, United

States Code, Section 1028A, Aggravated Identity Theft; (8) Title

18, United States Code, Section 2511(a) and (d), Wiretapping; and

(9) Title 18, United States Code, Section 371, Conspiracy.

III

## SUBJECT PREMISES

4.   **THE SUBJECT PREMISES** is located at 2326 W Monica Lane,

Santa Ana, 92706-1246.  **THE SUBJECT PREMISES** is described as a

one story blue house with a gray roof with grayish blue trim on

the south side of W Monica Lane.  The house numbers "2326" are in

gold and are to the left of the front door to **THE SUBJECT**

**PREMISES**.  The front door to **THE SUBJECT PREMISES** faces north and

is next to a window.  **THE SUBJECT PREMISES** is on south side of W

Monica Lane and backs up to another house separated by a brick

wall approximately 5 to 6 feet in height.  The front door to **THE**

**SUBJECT PREMISES** is white.  **THE SUBJECT PREMISES** has white

shutters on the windows.  **THE SUBJECT PREMISES** has and includes

an attached garage and includes all outbuildings.  The door to

the garage that is a part of **THE SUBJECT PREMISES** is white.

IV

## BACKGROUND REGARDING THE INTERNET,
## E-MAIL AND OTHER RELATED DEFINITIONS

5.   The following definitions relate to the Internet, e-

mail and other related tools as they apply to the activity

discussed in this affidavit:

3

a.   Internet:  The Internet is a collection of computers and computer networks that are connected to one another via high-speed data links and telephone lines for the purpose of communicating and sharing data and information.  Connections between Internet computers exist across state and international borders; therefore, information sent between two computers connected to the Internet frequently crosses state and international borders even where the two computers are located in the same state.

b.   E-mail:  E-mail, also known as "electronic mail," is a popular means of transmitting messages and/or files in an electronic environment between computer users.  When an individual computer user sends e-mail, it is initiated at the user's computer, transmitted to the subscriber's mail server, and then transmitted to its final destination.  A server is a computer that is attached to a dedicated network and serves many users.  An e-mail server may allow users to post and read messages and to communicate via electronic means.

c.   Internet Service Provider ("ISP"):  Many individuals and businesses obtain access to the Internet through businesses known as Internet Service Providers ("ISPs").  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages

4

through the ISP's servers; remotely store electronic files on their customers' behalf; and may provide other services unique to each particular ISP. ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them. Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

        d.    <u>Internet Protocol ("IP") Address</u>: An Internet Protocol address (or simply "IP" address) is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be properly directed from its source to its destination. Most ISPs control a range of IP addresses.

        d.    <u>Instant Messenger:</u> Instant Messenger ("IM") is a collection of technologies that create the possibility of real-time text-based communication between two or more participants over the Internet or some form of internal network/intranet. IM allows effective and efficient communication, allowing immediate receipt of acknowledgment or reply. In many cases, IM includes additional features, which make it even more popular. These

features include web-cams or services allowing users to talk directly for free over the Internet using a microphone and headphones.

      e.  <u>Remote Logger</u>: A keylogger is a piece of software or hardware that tracks the keys struck on a keyboard, typically in a covert manner so that the person using the keyboard is unaware that their actions are being monitored.  This allows the subject to learn the victim's passwords to all accounts accessed by the computer and to read all email and chat transactions.  A remote keylogger or "remote logger" can be secretly installed on a computer and can send logfiles of what the keylogger captured back to a secret person via the Internet.

      f.  <u>Microsoft:</u>  Microsoft is an international computer technology corporation which, among other things, offers users free, web-based email services.  Two of the web-based e-mail domains offered by Microsoft are Hotmail and MSN.

      g.  <u>No-ip.org:</u>  No-ip.org is a website offering dynamic domain name resolution.  This service can be used to hide the actual IP address of a hacker.  Ordinarily, malware might allow a hacker to connect directly to a victim's computer or through another computer that the hacker controls.  With no-ip.org, once installed on a victim's computer, the malware can connect to a no-ip.org account, rather than to an IP address controlled by (and identifiable as) the hacker's to control the malware.  This feature also enables the malware to continue to

6

work should the hacker's IP address ever change.

       h.  <u>America Online</u>:  America Online ("AOL"), an ISP, is an international computer technology corporation which, among other things, offers users free, web-based email services.  "AIM" is a  free online service offered by AOL that allows users to communicate in real time.

       i.  <u>"Sextortion"</u>:  Sextortion is the extortion and/or blackmail of an individual, wherein the item or service requested/demanded is the performance of a sexual act.

V

<u>PROBABLE CAUSE</u>

*March 10, 2010: FBI Executes Search Warrant at MIJANGOS'<br>RESIDENCE, THE SUBJECT PREMISES*

    6.  On March 8, 2010, I obtained a federal warrant authorizing the search of a residence located at 2326 W Monica Lane, Santa Ana, CA 92706-1246 (**THE SUBJECT PREMISES**) from the Honorable Patrick J. Walsh, United States Magistrate Judge, ~~the affidavit for which is attached hereto as Exhibit 1.~~ *T.A.R*.

    7.  On March 10, 2010, I along with other FBI agents executed the search warrant at 2326 W Monica Lane, Santa Ana, CA 92706-1246 (**THE SUBJECT PREMISES**).  During the execution of the search warrant, FBI Special Agent Jeffrey Kirkpatrick and I met with **MIJANGOS** and advised him of his <u>Miranda</u> rights.  **MIJANGOS** waived those rights orally and agreed to speak with us.  At that time, **MIJANGOS** told Special Agent Kirkpatrick and me the

7

following:

a.  **MIJANGOS** stated he studied computers and, in
particular, two computer programming languages, Java and C++.  He
added that he worked as an independent consultant, writing
programs for students and designing websites.  He stated he
earned, on average, $1,000 per week.

b.  **MIJANGOS** identified mijangos3@msn.com as his email
address and he stated he used the nickname "guicho."

c.  **MIJANGOS** communicated with "black hat" hackers and
made money transfers for them, although he declined to provide
further details.  **MIJANGOS** acknowledged he received credit card
information from one "black hat" hacker he knew as "Manhattan."
MIJANGOS said he was involved in sending packages of merchandise
purchased using stolen credit card information.  **MIJANGOS** said he
only played a minor role in online crime because it meant that he
would face less trouble from the police.  **MIJANGOS** would also
send the proceeds of the crimes to co-schemers around the world.

d.  **MIJANGOS** gained remote access to multiple computers
without consent.  **MIJANGOS** stated he knew that accessing
computers without the owners' consent was a crime, although he
initially claimed he only infected five computers.  He sometimes
infected computers by putting malware on peer-to-peer networks[1]

---

[1]"Peer to peer" networks are computer networks in which each
computer, or peer, shares files with others such that each
computer can be a "server" or a "client."

8

that would be misdescribed as songs such that, if unwitting users tried to download the songs, they would become infected.

e.   **MIJANGOS** stated that he programmed "crypters," that is, software that made programs undetectable to antivirus programs that could be used to illegally, and surreptitiously, infect victim computers.

f.   **MIJANGOS** stated he hacked into female victim accounts at the request of boyfriends and husbands to determine whether the female victims were cheating on their boyfriends or husbands. **MIJANGOS** said he was supposed to be paid for this conduct but was not. **MIJANGOS** acknowledged he threatened to expose these pictures, acknowledged the threats might look like extortion, but stated that he did so to discourage anyone from contacting the authorities. **MIJANGOS** also acknowledged he asked for additional sexual videos but only to determine whether they would actually do it.

8. During the execution of the search warrant, I learned that several digital devices were seized including one Sony Vaio PCG-Z1 WAMP Laptop, Model PCG-51AL S/N 28167630 3204525, service tag J0006CCV; one Sony Memory Stick Pro Duo, Model MSX-M256S, S/N AASB1000000; one HP Pavilion Laptop, Model ZE4500US, S/N CNF33616V5; one Gateway Laptop, Model M352WVN S/N 0032532734; one USB thumb drive; two SanDisk Cruzer Micro Thumb Drives; one micro center thumb drive; one Verbatim thumb drive; one SanDisk SD card; one HP DVD-R; one Ipod Nano; four memorex

CD-R; one unmarked CD; one Blackberry cell phonen; and one Apple

Macbook laptop, serial number W8903TAT1AQ.

### *FBI Finds Sexually Explicit Movies and Photographs of Juveniles, Identity Theft Material, and other Contraband on Digital Devices at MIJANGOS' Residence, THE SUBJECT PREMISES*

9.    A filter team reviewed the above-listed digital devices

in accordance with the protocol set forth in the warrant and

provided Special Agent Kirkpatrick and myself the data falling

within the list of items to be seized set forth in the warrant.

Upon reviewing the data, SA Jeffrey Kirkpatrick and I determined

the following:

a.    **MIJANGOS** possessed files related to approximately

129 different computers, corresponding to approximately 230

users.

i.    Of the 230 victims identified, 44 were

subsequently determined to be juveniles through contacts with

their schools, social networking sites and, in some instances,

interviews.

ii.    Various different kinds of victim information

was stolen, including, but not limited to, passwords and

authentication information, credit card information, and other

personal data.

b.    **MIJANGOS** kept copies of several different kinds of

malware on his computer that he had control over.

i.    The software provided **MIJANGOS** access to all

files, photos, and videos on the infected computer, in addition

10

to allowing **MIJANGOS** to see everything typed on the infected computer.

        ii.   The malicious software **MIJANGOS** used allowed him to, at will, turn on any web camera and microphone attached to an infected computer in order to watch and listen to unknowing victims.

        iii.   Some of the malicious software was encoded with the domain name mijangos.no-ip.org.  I know from my investigation and, based on my training and experience, that the malware caused the infected computers to send a signal to the domain name mijangos.no-ip.org, which I know was controlled by **MIJANGOS**.  **MIJANGOS** was therefore able to control the infected computers through whatever computer he assigned the mijangos.no-ip.org domain.

        c.   Dozens of videos appearing to be the product of the activation of web cameras without authorization were saved on the digital devices and showed the unknowing victim in some sort of undress (i.e. getting out of the shower, dressing for the day, having sex with a partner).  Many of these victims remain unidentified but many appeared to be juveniles.

        d.   **MIJANGOS** maintained screen captures of credit card, online account and other financial websites showing victim personal identifying information.  This information included victim accounts with TurboTax, T-Mobile, Netflix, Paypal, HSBC, and Chase Bank.  This data was organized in a file titled "things

inportan," [sic] which I know, based on my training and experience is consistent with identity thieves stockpiling data harvested from victim computers.

e. **MIJANGOS** had one audio file that involved an intercepted communication of a victim. The recording captured the victim's cell phone ringing, her answering her cell phone near the computer, and her speaking with an unidentified caller.

f. **MIJANGOS** kept files containing AIM communication between himself and "Manhattan" during which they discussed identity theft topics. One such file was titled "CVV News." I know from my training and experience that the "CVV" is the authentication code on the back of a credit card often needed to make online purchases.

### *MIJANGOS Extorts Victim K.S. on or About August 14, 2008 with Information Stolen from Her Computer*

10. Based on my review of the contents of yosoylammer@hotmail.com obtained through the state search warrant and a federal search warrant, I know the following:

a. On August 13, 2008, **MIJANGOS** sent victim K.S., who resides in the State of Washington, an mail titled "read this and be smart."

b. In the email, **MIJANGOS** attached pornographic photographs of K.S. and told her that he knew she worked at humaniplex.

c. On or about that same date, **MIJANGOS** wrote:

"You have three kids and an psycho ex but hat I don't care if you don't want this pics and the rest I have from you to be publsihed this is what I want. A porn vido of you 'you can blur your face;' if don't get the video ina day I will publish thse images and let your family know about your dark side as a hooker so you better do that video send it tome via email and you will never hear from me ever. [K.S.] you stupid don't trust their members they sold you big time - and don't tell people and LE about this email not even your dumb lwayers friends or for sure I will let your family know about your pics work etc. You have a day.

d.    On or about that same date, **MIJANGOS** emailed her another message stating:

"am not playing you have six hours and don't' be stupid changing your emails or myspce passwords wont change a thing you know it six hors if I don't hear from you then your family will hear from me."

e.    On or about January 26, 2010, I interviewed K.S. and learned the following:

i.    K.S. confirmed she received the emails and

13

photos from yosoylammer@hotmail.com.

        ii.  K.S. stated that the photos **MIJANGOS** had attached to the email were from a boyfriend who had emailed them to her.  They were in her inbox; however, she had not uploaded them to her computer.  K.S. did not authorize anyone to access those photographs.

### Victim N.W. Had Her Computers Hacked and Her Webcams Appeared to be Accessed Without Her Authorization in the Last Month

    10.  On June 9, 2010, I interviewed victim N.W. and learned the following:

        a.  Approximately four months ago victim N.W., who is 20 years old, received an instant message from her friend, victim J.Y., who is 15 years old, with a attached file titled "scary". N.W. attempted to open the file but nothing happened.

        b.  N.W. then called J.Y. who stated she was not online and had not instant messaged N.W.

        c.  As of approximately May 19, 2010, N.W. believed that her web camera was randomly turning on (because the web camera's light would turn on without N.W. doing so) without N.W.'s authorization.  N.W. stated that she is scared that her computer, which is located in her bedroom, is "hacked" and that someone is watching her.  N.W. said she put a sticker over the web camera that is on her laptop computer and is not using the camera.

14

### *Juvenile Victims T.Y. and J.Y. Had their Computers Hacked and Their Webcams Appeared to be Accessed Without their Authorization in the Last Month*

11.  On June 15, 2010, I interviewed victim J.Y. and learned the following:

a.  Approximately four months ago, J.L. AIM'ed J.Y. an attachment that J.Y. could not get to open.

b.  A few days later J.L. stated that she had not AIM'ed J.Y. and that someone hacked her account.

c.  J.Y. stated that on April 3, 2010, someone without authorization used her AIM account to AIM N.W. an attachment that N.W. attempted to open.

d.  On or about April 3, 2010 someone also used J.Y.'s AIM account to AIM her sister T.Y. an attachment.  Both sisters were in the same house and T.Y. asked J.Y. if she was AIM'ing her to which J.Y stated she was not.

12.  Upon reviewing the evidence recovered from **MIJANGOS**'s computers from the original search I discovered the following:

a.  There is a keylogger file dated April 3, 2010 that contained the conversation between J.Y. and T.Y. where it appears J.Y. infected T.Y. with the malicious software.

b.  There is a keylogger file for N.W. starting on April 3, 2010, which indicated that was the date her computer was infected.

c.  The malicious software used had the ability to turn on the web camera and microphone.

13.   On or about June 9, 2010, I interviewed victim T.Y. and learned the following:

a.   Around March of 2010, victim T.Y., who is 17 years old, received a instant message from her sister J.Y., which T.Y. found odd, since J.Y. was in the same house, in the next room.

b.   The instant message had a file attached to it, titled "scary," and asked T.Y., "do you want to see something scary".  T.Y. did not open the file and instead asked J.Y if J.Y. was messaging her on AIM.   J.Y. said she was not.

c.   Both T.Y. and J.Y. believe that the web cameras on their laptops, which they usually keep in their bedrooms, have turned on without their input or permission, based on the web camera light turning on, as recently as June 7, 2010.

### Juvenile Victim M.T. Had Her Computer Hacked and Her Webcam Appeared to be Accessed Without Her Authorization in the Last Month

14.   On or about June 9, 2010, I interviewed victim M.T. and learned the following:

a. Approximately three months ago victim M.T., who is 16 years old, received a instant message from "goldlion14."[2] M.T. did not respond to the messages.

b.   M.T. stated that she believes that the web camera

---

[2] As stated in the Exhibit 1, on March 8, 2010, I received information from America Online regarding instant messenger account "goldlion14."  AOL has this account listed as active, with an IP address of 76.93.107.97, the IP address associated and registered to **THE SUBJECT PREMISES**.

on her laptop, which she typically keeps in her bedroom, has been turning on by itself, based on the web camera light turning on, since approximately February 2010, and was turning on as recently as one month ago.

### *MIJANGOS Continued to Access the No-ip.org Account, which He Had Used After the Search Warrant Was Executed at His Residence (THE SUBJECT PREMISES)*

15.  On June 10th, 2010 I received account information from no-IP.org for the subscriber of Mijangos.no-ip.org and learned the following:

a. On June 1, 2010 the account information was updated to the name "guicho guichol."  I know from my interview with **MIJANGOS** and review of the items seized pursuant to the previously executed search warrant that **MIJANGOS** uses the nickname "Guicho," had files on his computer saved under this name, and had T-shirts made with "Guicho" written on the front.

b. The email account associated with the account is mijangos3@msn.com, and the home address is listed as 10210 W Monica Lane, Santa Ana, OR 97702.  The phone number associated with the account is 714-210-9945 and the user name is "guicho".

c.  The current IP Address for Mijangos.no-ip.org is 75.82.20.170.  Any Internet traffic intended for mijangos.no-ip.org is routed to the IP Address 75.82.20.170.  This I.P. address is still valid and was in use up until June 9, 2010, when no-ip.org disabled the account for violating the terms of service for no-ip.org.

17

16.   On or about March 1, 2010, I learned that the address 10210 W Monica Lane, Santa Ana, OR 97702 does not exist as a legitimate address by running the address through Google maps and Mapquest.   I also spoke with Special Agents who work in that area who confirmed this address to be invalid.   The address associated with the Mijangos.no-ip.org account was the **SUBJECT PREMISES** until it was changed on March 1, 2010.   At the time of his interview on March 10, 2010, **MIJANGOS** admitted that he changed the address purposely.

17.   On June 10, 2010, I received information from Road Runner confirming that the IP address 75.82.20.170 is still registered to **MIJANGOS** at the **SUBJECT PREMISES** and is still valid and in use.

18.   Further, it is my belief, based on my training and experience and the information contained in this affidavit, that evidence pertaining to the investigation of federal crimes is currently present within the **SUBJECT PREMISES**.

**V.**

**TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

19.   As used below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as

18

keyboards, printers, scanners, plotters, monitors, and drives
intended for removable media; related communications devices such
as modems, cables, and connections; storage media such as hard
disk drives, floppy disks, compact disks, magnetic tapes, and
memory chips; and security devices.  Based on my knowledge,
training, and experience, as well as information related to me by
agents and others involved in the forensic examination of digital
devices, I know that data in digital form can be stored on a
variety of digital devices and that during the search of the
premises it is not always possible to search digital devices for
digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly
technical process that requires specific expertise and
specialized equipment.  There are so many types of digital
devices and software in use today that it is impossible to bring
to the search site all of the necessary technical manuals and
specialized equipment necessary to conduct a thorough search.  In
addition, it may also be necessary to consult with specially
trained personnel who have specific expertise in the type of
digital device, software application or operating system that is
being searched.

b.   Digital data is particularly vulnerable to
inadvertent or intentional modification or destruction.
Searching digital devices can require the use of precise,
scientific procedures that are designed to maintain the integrity

19

of digital data and to recover "hidden," erased, compressed, encrypted or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 500 gigabytes (GB) of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 240 million pages of data, that, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 GB drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-

available forensics tools.  Normally, when a person deletes a
file on a computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space, i.e., space on the hard drive that is not allocated to an
active file or that is unused after a file has been allocated to
a set block of storage space for long periods of time before they
are overwritten.  In addition, a computer's operating system may
also keep a record of deleted data in a swap or recovery file.
Similarly, files that have been viewed via the Internet are
automatically downloaded into a temporary Internet directory or
cache.  The browser typically maintains a fixed amount of hard
drive space devoted to these files, and the files are only
overwritten as they are replaced with more recently viewed
Internet pages.  Thus, the ability to retrieve residue of an
electronic file from a hard drive depends less on when the file
was downloaded or viewed than on a particular user's operating
system, storage capacity, and computer habits.  Recovery of
residue of electronic files from a hard drive requires
specialized tools and a controlled laboratory environment.

          e.  Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processor, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.

In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole.  Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used.  Web browsers, e-mail programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment.

22

f.    Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment.

VI

**ITEMS TO BE SEIZED**

20.    Based on the foregoing, I also respectfully submit that there is probable cause to believe that the following items, which constitute evidence of violations of (1) Title 18, United States Code, Section 875(d), Extortion; (2) Title 18, United States Code, Section 1029, Access Device Fraud, (3) Title 18, United States Code, Section 1030(a)(2)(C), (c)(2)(B)(ii), Obtaining Information from a Protected Computer in Furtherance of a Criminal and Tortious Act; (4)  Title 18, United States Code, Section 1030(a)(5)(A), Intentional Damage to a Protected Computer; (5) Title 18, United States Code, Section 1343, Wire

23

Fraud; (6) Title 18, United States Code, Section 1344, Bank Fraud, (7) Title 18, United States Code, Section 1028A, Aggravated Identity Theft; and (8) Title 18, United States Code, Section 2511(a) and (d) Wiretapping, will be found at **THE SUBJECT PREMISES**:

a. Records, documents, correspondence, logs and other items referring to yosoylammer@hotmail.com;

b. Records, documents, correspondence, logs and other items referring to gui_blt;

c. Records, documents, correspondence, logs and other items referring to chirst@yahoo.com, mistahxxxrightme@aim.com, zapotin@hotmail.com, guich_x@aim.com, instant message account goldlion14, guicho_1.1@roadrunner.com, mijangos3@msn.com;

d. Records, documents, correspondence, logs and other items related to the unauthorized access of computer systems and malicious computer activity;

e. Records, documents, correspondence, logs and other items related to malicious computer code, including worms, viruses, Trojan horses, rootkits and bots;

f. Malicious computer code, to include including worms, viruses, Trojan horses, rootkits, sypnet software, and bots;

g. Records, documents, correspondence, logs and other items referring to or related to the unauthorized access of computer systems and malicious computer activity;

h. Records, documents, correspondence, logs and other

24

items relating to Luis Mijangos;

i. Records, documents, programs, applications and materials describing, explaining or illustrating methods for gaining access to computers or computer networks;

j. Records, documents, programs, applications and materials relating to any attempts to gain unauthorized access to computers or computer networks;

k. Records, documents and material relating to providers including hotmail.com, no-ip.org;

l. Indicia of occupancy of or residency in **THE SUBJECT PREMISES**, including invoices, letters, bills, personal effects, and mortgage and loan agreements tending to show ownership, occupancy or control of **THE SUBJECT PREMISES** or any of the categories of items set forth above that are found at **THE SUBJECT PREMISES**;

m. Records, documents, programs, applications and materials relating to any attempts to gain unauthorized access to computers or computer networks.

n. Records, documents, programs, applications and materials, files pertaining to remote access, access without authorization, backups, virtual machines, photographs, videos and passwords;

o. Records, documents, programs, applications and materials, and files describing personal information not belonging to Luis Mijangos;

25

p. Records, documents, programs, applications and materials, and files containing any reference to sextortions, extortions, blackmail attempts and threats of physical, mental or physiological harm.

q.   Records, documents, programs, applications and materials relating to the deletion, uploading, and/or acquisition of victim files to include, photos, videos, emails, chat logs and other files.

r. Records, documents, programs, applications and materials, emails, instant message communications, and Western Union transactions to, with or regarding a user with the screen name "Manhattan"

s.   The digital devices used to facilitate the above-listed violations and forensic copies thereof;

t.   With respect to any digital devices falling within the scope of the foregoing search categories, or any digital devices containing evidence falling within the scope of the foregoing search categories, records, documents, programs, photos, videos, applications or materials, or evidence of the absence of same, sufficient to show the actual user(s) of the digital deices during the time period between July 2008 and the present.

21.  As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any

form, including in digital form on any digital device and any forensic copies thereof.  As used both above and below, the term "digital device" includes any electronic system or device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media such as hard disk drives, floppy disks, compact disks, magnetic tapes, and memory chips; and security devices.

22.  In searching for digital devices and in searching digital data stored on digital devices, law enforcement personnel executing this search warrant will employ the following procedure:

a.   The physical search of the premises will be conducted by law enforcement agents who are investigating the crimes described in the affidavit (the "investigating agents"). Upon securing the premises, these investigating agents will, if they can do so without reviewing the contents of the digital data contained on any digital device, seek to determine if the digital device is itself an item to be seized or contains data falling within the scope of the items to be seized under this warrant.

If, without reviewing the contents of the digital data contained thereon, the investigating agents can make the determination that a digital device is itself an item to be seized or contains data falling within the scope of the items to be seized under this warrant, that digital device will be seized.  In attempting to determine whether any digital device is itself an item to be seized or contains data falling within the scope of the items to be seized as described in this subparagraph, the investigating agents will not review the digital contents of any such device or any indexes or summaries thereof.

b.   If the investigating agents conclude that they cannot make the determination that a digital device is itself an item to be seized or contains data falling within the scope of the items to be seized under this warrant without reviewing the contents of the digital data contained on the digital device, the investigating agents will consult with law enforcement personnel and/or others aiding law enforcement personnel and acting at their direction who are not involved in the investigation of the crimes described in the affidavit (the "filter team").  The filter team will include law enforcement personnel and/or others aiding law enforcement personnel and acting at their direction specially trained in searching, seizing and segregating digital data (the "computer personnel").  The filter team will be consulted (either on-site or off-site) to determine whether the digital device can be searched on-site in a reasonable amount of

28

time and without jeopardizing the ability to preserve data contained on the digital device.

c.    If the filter team determines that the digital device can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, it will be searched on-site only by members of the filter team in a forensically sound fashion that will permit the filter team to make an initial determination whether it is subject to seizure, and will be seized only if the search by the filter team reveals it to be an item to be seized or to contain any data that falls within the list of items to be seized under this warrant.

d.    If the filter team determines that the digital device cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, then the digital device will be seized and transported to an appropriate law enforcement laboratory or similar facility for search by members of the filter team.  The digital device or a forensic image thereof will be searched only by members of the filter team in a forensically sound fashion and in a manner that allows the data thereon to be reviewed as effectively as possible.

e.    As explained in paragraphs 19(d) and (e), data falling within the items to be seized in this warrant may be resident in any portion of the digital device.  Such data also may be in partial or incomplete form.  As a consequence, in searching the digital device, the filter team may examine all of

29

the data contained in the digital device or the forensic copy capable of containing items to be seized as specified in this warrant to view its precise contents and determine whether the digital device and/or data falls within the items to be seized as set forth herein.  The filter team may also search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.  Although the filter team may examine the entire digital device, the filter team will do so only by using search protocols specifically designed to identify items to be seized under this warrant as set forth in greater detail in subparagraph (g) below.

        f.        Following a seizure of a digital device pursuant to subparagraphs 22(a), (c), or (d) above, the filter team will examine the digital device to extract and seize any data that falls within the list of items to be seized set forth herein.  The filter team will seize and retain only data that falls within the scope of the items to be seized under this warrant.  Absent an additional warrant or further order of the Court, the filter team will not seize or retain, whether as being in plain view or for any other reason, data that does not fall within the scope of the items to be seized under this warrant.

        g.   In searching a digital device, the filter team will only use search protocols specifically designed to identify items to be seized under this warrant.  These search protocols

may include the use of tools to exclude normal operating system files that do not need to be searched.

h.   The filter team will not disclose to this affiant or any other investigating agent, or any Assistant United States Attorney involved in this investigation, any data contained on the digital device other than that which is seized as falling within the scope of the items to be seized under this warrant except with prior Court authorization.   The filter team may disclose to this affiant and any other investigating agent or any Assistant United States Attorney involved in this investigation any data contained on the digital device that is seized as being within the scope of the items to be seized under this warrant without further order of the Court.

i.   The filter team will complete its search of the digital device as soon as is practicable but not to exceed 60 days from the date of execution of this warrant.   If additional time is needed, the government may seek an extension of this time period from the Court within the original 60 day period from the date of execution of the warrant.

j.   If the search determines that the digital device is not itself an item to be seized and does not contain any data falling within the list of the items to be seized pursuant to this warrant, the government will return the digital device and delete or destroy all the forensic copies thereof.

k.   If  (i) the search determines that the digital

device is itself an item to be seized or contains digital data
falling within the list of the items to be seized under this
warrant or (ii) the filter team believes there is an adequate
factual and legal basis other than the plain view doctrine upon
which to retain the digital device (if outside the list of items
to be seized under this warrant) or the digital data contained on
the device that is outside the list of items to be seized under
this warrant, the filter team may, prior to making the return
described in subparagraph (l) below, seek from the Court an order
authorizing the filter team to retain such digital device or
digital data.  In the event that the government obtains such an
order, the digital device or digital data retained pursuant to
such an order shall be held by the filter team and, absent
further order of the Court, shall not be disclosed to the
investigating agents or any Assistant United States Attorney
involved in the investigation.

   1.  Separate from the search warrant return made by
the investigating agents, the filter team will certify and make a
return to the Court regarding the seizure of digital devices,
forensic copies, and digital data.  Such return shall be made as
soon as practicable but in any event no later than 14 days after
the completion of the search described in subparagraph (f) above.
The return will contain the following: (i) a detailed listing of
all digital devices seized and retained as themselves falling
within the list of items to be seized under this warrant; (ii) a

detailed listing of all digital data seized, retained, and disclosed to the investigating agents as falling within the list of the items to be seized under this warrant; (iii) a detailed listing of all digital devices and digital data that the filter team has returned to the party from whom the devices and data were seized; (iv) copies of any court orders authorizing the filter team to seize and retain digital devices and digital data not falling within the list of the items to be seized under this warrant together with a detailed listing of all digital devices and digital data seized and retained pursuant to these court orders; and (v) a certification that all other digital devices and digital data that the filter team have not been authorized to seize and retain have been destroyed or returned.

      m.  At this time, the individuals believed to be the owners of the digital devices are suspected of a crime, and the procedures set forth above are tailored to protect the privacy interests of other parties who are not under suspicion of criminal wrongdoing.

    23.  In order to search for data that is capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items, subject to the procedures set forth above:

      a.  Any digital device capable of being used to commit, further or store evidence of the offense listed above;

      b.  Any equipment used to facilitate the transmission,

creation, display, encoding or storage of digital data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices and optical scanners;

       c.   Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones and personal digital assistants;

       d.   Any documentation, operating logs and reference manuals regarding the operation of the digital device or software used in the digital device;

       e.   Any applications, utility programs, compilers, interpreters and other software used to facilitate direct or indirect communication with the digital device;

       f.   Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

       g.   Any passwords, password files, test keys, encryption codes or other information necessary to access the digital device or data stored on the digital device.

    24.   The special procedures relating to digital media found in this warrant govern only the search of digital media pursuant to the authority conferred by this warrant and do not apply to any search of digital media pursuant to any other court order.

34

IV.

## CONCLUSION

25.   Based on the foregoing facts, I respectfully submit
that there is probable cause to believe that **LUIS MIJANGOS**
committed a violation of Title 18, United States Code, Section
1030(a)(2)(C), (c)(2)(B)(ii), Obtaining Information from a
Protected Computer in Furtherance of a Criminal and Tortious Act.
There is also probable cause to believe evidence, contraband,
fruits, and/or instrumentalities of violations of constitute the
fruits, instrumentalities, and evidence of violations of (1)
Title 18, United States Code, Section 875(d), Extortion; (2)
Title 18, United States Code, Section 1029, Access Device Fraud,
(3) Title 18, United States Code, Section 1030(a)(2)(C),
(c)(2)(B)(ii), Obtaining Information from a Protected Computer in
Furtherance of a Criminal and Tortious Act; (4)  Title 18, United
States Code, Section 1030(a)(5)(A), Intentional Damage to a
Protected Computer; (5) Title 18, United States Code, Section
1343, Wire Fraud; (6) Title 18, United States Code, Section 1344,
Bank Fraud, (7) Title 18, United States Code, Section 1028A,
Aggravated Identity Theft; (8) Title 18, United States Code,
Section 2511(a) and (d) Wiretapping, and (9) Title 18, United

States Code, Section 371, Conspiracy, will be found at the

**SUBJECT PREMISES** 2326 W Monica Lane, Santa Ana, California 92706-

1246.

Tanith A. Rogers
Special Agent
Federal Bureau of Investigation


Sworn to before me and subscribed

this 17th day of June, 2010


HON. ROSALYN M. CHAPMAN
UNITED STATES MAGISTRATE JUDGE

1